## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

ELAINE THOMPSON, INDIVIDUALLY AND                    **PLAINTIFFS**
AS PERSONAL REPRESENTATIVE OF THE ESTATE
OF JOHNNY DALE THOMPSON, JR., DECEASED

v.                          NO. 4:11-CV-0379BSM

SALINE COUNTY SHERIFF PHIL MASK, INDIVIDUALLY AND
AS FORMER SHERIFF OF SALINE COUNTY, ARKANSAS; et al          **DEFENDANTS**

### PLAINTIFF'S EXHIBITS TO PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PLEASE SEE ATTACHED EXHIBITS REFERENCED IN PLAINTIFF'S
RESPONSE TO DEFENDANT'S SUMMARY JUDGMENT MOTION

Respectfully submitted,

By:  /s/Guy "Randy" Satterfield
    Guy "Randy" Satterfield, AR Bar 81140
    Attorney for Plaintiffs
    SATTERFIELD LAW FIRM, PLC
    P.O. Box 1010
    Little Rock, Arkansas 72203-1010
    Tele: (501) 376-0411, Fax: 374-2834
    Email: satterfieldlaw@comcast.net

### CERTIFICATE OF SERVICE

I hereby certify that I have delivered the above document to Mr. George D.
"Bucky" Ellis, attorney for the defendants, on this 29th day of May, 2012, via the ECF electronic
noticing system.

Guy "Randy" Satterfield
Guy "Randy" Satterfield

**OFFICIAL**

**DETENTION FACILITY COMPLIANCE REPORT**

RECEIVED

MAR 2 9 2007

BY:_____

NAME OF FACILITY _SALINE CO. Jail_

ADDRESS _735 Neeley St., Benton, AR 72015_

COUNTY (JUDGE) OR MAYOR _Lanny Fite_

FACILITY SUPERVISOR _Lt. Hugh Gentry_          FACILITY PHONE _501-303-5603_

PERSON INTERVIEWED _Lt. Hugh Gentry_          TITLE _Jail Admin_

(SHERIFF) OR CHIEF OF POLICE_____    _PHIL MASK_

LOCATION OF JAIL _____ _SAB_

DATE OF CONSTRUCTION _2006_          DATE REMODELED_____

CELL DESIGN          MAXIMUM CAPACITY _183_

1 MAN____ SIZE____X____ SQ. FT.____    _____ SIZE____X____ SQ. FT.____

2 MAN____ SIZE____X____ SQ. FT.____    _____ SIZE____X____ SQ. FT.____

3 MAN____ SIZE____X____ SQ. FT.____    _____ SIZE____X____ SQ. FT.____

4 MAN____ SIZE____X____ SQ. FT.____    _____ SIZE____X____ SQ. FT.____

HOW MANY PAID PERSONNEL (JAILORS & MATRONS) ARE ASSIGNED DUTIES IN THE JAIL? _29_

Supervisors _5_          Full Time Males _18_          Full Time Females _11_

Part Time Males_____          Part Time Females _4 Transport Officers_

WHAT IS THE SHIFT FORMULA?

_5Am_ TO _5pm_          _5pm_ TO _5Am_          _____ TO_____

HOW MANY PERSONNEL TO EACH SHIFT INCLUDING SUPERVISORS? _8 + 6_

Sign _Wayne F. Chm_          Inspection Date _14 MAR 07_
        Committee Member

Sign _Betty English_          Sign _Sarah K. Ollar_
        Committee Member                    Committee Member

Sign _Jim Morley_          Sign_____
        Committee Member                    Committee Chairman

Sign _Charl S___          Sign _Lt Hugh Gentry_
        Committee Member                    Person Interviewed

Plaintiff's Exhibit 1

**STATE OF ARKANSAS**
**ADULT DETENTION FACILITIES**

DETENTION FACILITY _SALINE CO._          DATE OF INSPECTION _14 MAR 0_

All Adult Detention Facilities in Arkansas must comply with all applicable mandatory requirements. Failure to meet applicable requirements will cause the facility to be considered in non-compliance and subject to further action by this Agency in compliance with Act 530 of 1985 - Section 4.

<u>MINIMUM MANDATORY REQUIREMENTS</u>                                 <u>IN COMPLIANCE</u>

III.   ADMINISTRATION:

Does the Facility's operations comply with requirements as stated in Chapter III relative to the following:

Section 3 - 1004 -        Written Policy              YES ✓ NO____ N/A____

Section 3 - 1005 -        Budget                     YES ✓ NO____ N/A____

IV.   PERSONNEL:

Does the facility meet personnel requirements as stated in Chapter IV relative to the following:

Section 4 - 1002 -        Personnel file with required
A - B - C - D             records.                   YES ✓ NO____ N/A____

Section 4 - 1002 - E      Has each employee completed
                          the basic jail course?     YES____ NO ✓ N/A____
                          2 Need Training

Section 4 - 1002 - H      Does the facility have
                          sufficient personnel?      YES____ NO ✓ N/A____

                          If not, has the administrator
                          requested such in writing?  YES____ NO ✓ NA____

V.   RECORD SYSTEM:

Does the facility maintain a minimum record system in compliance with Chapter V relative to the following:

Section 5 - 1002 -        Are proper papers for commit-
                          ment being maintained?     YES ✓ NO____ N/A____

Section 5 - 1003 -        Is a proper jail log or detention
                          record being kept?         YES ✓ NO____ N/A____

1

V.   RECORD SYSTEM:  continued

    Section 5 – 1004 –    Is confinement information being
                     gathered on each inmate?                    YES __✓__ NO____ N/A____

    Section 5 – 1005 –    Is prisoner's personal property
                     being handled properly?                     YES __✓__ NO____ N/A____

    Section 5 – 1006 –    Are proper medical records
                     being kept relating condition
                     of prisoner at intake?                      YES __✓__ NO____ N/A____

    Section 5 – 1007 –    Does the facility have a written
                     policy on strip searches?                   YES __✓__ NO____ N/A____

    Section 5 – 1008 –    Is a copy of the jail rules pro-
                     vided to the prisoner?                      YES __✓__ NO____ N/A____

    Section 5 – 1010 –    Are disciplinary actions recorded
                     in writing?                                 YES __✓__ NO____ N/A____

    Section 5 – 1011 –    Is there a written record of
                     unusual occurrences?                        YES __✓__ NO____ N/A____

VI.  RIGHTS OF ACCUSED IN CUSTODY:

    Section 6 – 1001 –    Are inmate rights posted and is
                     a copy furnished them?                      YES __✓__ NO____ N/A____

    Section 6 – 1002 –    Do inmate rights contain provi-
                     sions A thru G?                             YES __✓__ NO____ N/A____

    Section 6 – 1003 –    Does written policy for disci-
                     plinary actions provide for
                     requirements A thru D?                      YES __✓__ NO____ N/A____

VII.  RULES OF CONDUCT FOR PERSONNEL:

    Section 7 – 1001 –    Does facility policy and proce-
            1002 –    dures manual provide for require-
                     ments listed in these sections?             YES __✓__ NO____ N/A____

VIII.  PRISONER SEPARATION:

    Section 8 – 1001 –    Does the facility provide com-
                     plete separation of females from
                     the area where males are con-
                     fined?                                      YES __✓__ NO____ N/A____

    Section 8 – 1001 –    Are juveniles, charged as adults,
                     separated from the rest of the
                     inmates?                                    YES __✓__ NO____ N/A____

2

VIII.  PRISONER SEPARATION:   Continued

Section 8 – 1001 –   Are youthful offenders under age 18, who are under The Juris-diction of The Juvenile Court incarcerated?          YES____ NO__✓__ N/A____

Section 8 – 1001 –   If so, are they completely sep-arated from the rest of the jail population?          YES____ NO____ N/A__✓__

Section 8 – 1001 –   Are prisoners being separated by class?          YES__✓__ NO____ N/A____

Section 8 – 1002 –   Are work release and trusty prisoners separated from other prisoners?          YES__✓__ NO____ N/A____

IX.  SECURITY:

Does the facility's security procedures and practices comply with minimum requirements as stated in Chapter IX relative to the following:

Section 9 – 1001 – A   Does the facility have sufficient personnel on duty at all times?          YES____ NO__✓__ N/A____

Section 9 – 1001 – A – B –   Are proper cell checks being made and recorded?          YES__✓__ NO____ N/A____

Section 9 – 1001 – C   Are female officers on duty when females are incarcerated?          YES__✓__ NO____ N/A____

Section 9 – 1001 – D   Does the policy manual have a search procedure for control of contraband?          YES__✓__ NO____ N/A____

Section 9 – 1001 – E   Does the policy manual have a procedure for emergency sit-uations which includes what to do in case of fire, escapes, riots, smoke situations, inmate disturbances and assaults?          YES__✓__ NO____ N/A____

Section 9 – 1001 – G   Are officer's weapons removed before entering secure area?          YES__✓__ NO____ N/A____

Section 9 – 1001 – I   Does the facility have a policy for key control?          YES__✓__ NO____ N/A____

Section 9 – 1001 – J   Does the facility have a written policy addressing security mea-sures for trusty-status inmates?          YES__✓__ NO____ N/A____

3

X. MEDICAL, DENTAL AND MENTAL HEALTH CARE:

Section 10 – 1001 – Does the facility have a medical and dental plan in writing and on file to insure that medical services or practices are available to all those in custody? YES ✓ NO____ N/A____

Section 10 – 1002 – If medical care is provided at the facility, is proper space provided? *By Local providers* YES____ NO____ N/A ✓

Section 10 – 1003 – Does the facility have an emergency and sick call procedure? YES ✓ NO____ N/A____

Section 10 – 1004 – Are written records of inmate's medical and dental complaints being kept? Does this record include results of the health encounter? YES ✓ NO____ N/A____

Section 10 – 1005 – Are records kept of medicine prescribed and administered? YES ✓ NO____ N/A____

Section 10 – 1005 – Is medicine kept in a secure area? YES ✓ NO____ N/A____

Section 10 – 1009 – Is there a medical training program such as C.P.R. and first aid or a suitable alternative? YES ✓ NO____ N/A____

XI. MAIL, COMMUNICATIONS AND VISITING:

Does the facility comply with minimum requirements regarding privileges as stated in Chapter XI relative to the following:

Section 11 – 1001 – Rules for visiting? YES ✓ NO____ N/A____

Section 11 – 1002 – Is a visitor's log kept? YES ✓ NO____ N/A____

Section 11 – 1005 – thru
11 – 1009 – Is there a written policy for correspondence and incoming mail? YES ✓ NO____ N/A____

Section 11 – 1010 – Is there a written policy for use of the phone and are prisoner's calls logged where necessary? YES ✓ NO____ N/A____

XII. FOOD SERVICE:

Section 12 – 1001 – Are meals being served as required? YES ✓ NO____ N/A____

4

XII.    FOOD SERVICE:  conti..ed

\*       Section 12 – 1001 –        Are menus approved by a dietician?      YES__✓__NO_____N/A_____

        Section 12 – 1002 –        Are records being kept of the
                                   food actually served?                   YES__✓__NO_____N/A_____

        Section 12 – 1003 –        Has kitchen been inspected by
                                   Health Department?                      YES__✓__NO_____N/A_____

        Section 12 – 1006 –        Is garbage removed from the
                                   cells immediately after eating?         YES__✓__NO_____N/A_____

\*   24 hour overnight facilities are exempt


XIV.    SAFETY:

        Section 14 – 1002 –        Has the facility been inspected
                                   by local fire department in the
                                   past year?                              YES__✓__NO_____N/A_____

        Section 14 – 1003–         Does the facility have a written
                                   fire plan and is personnel
                                   familiar with it?                       YES__✓__NO_____N/A_____

        Section 14 – 1004 –        Does the facility have a written
                                   plan for all other emergencies
                                   and are evacuation procedures
                                   detailed?                               YES__✓__NO_____N/A_____

        Section 14 – 1005 –        Are exits plainly marked?               YES_✓__NO_____N/A_____

        Section 14 – 1006 –        Are cleaning fuids, toxic and
                                   caustic materials stored pro-
                                   perly?                                  YES_✓__NO_____N/A_____

        Section 14 – 1008 –        Does the facility have up to
                                   date fire fighting equipment
                                   and access to a compressed air
                                   breathing apparatus?                    YES_✓__NO_____N/A_____


XV.     INMATE SERVICES:

\*       Section 15 – 1002 –        Does the facility have a written
                                   policy to provide recreation and
                                   leisure time activities, library
                                   services, social and religious
                                   services?                               YES__✓__NO_____N/A_____

\*       Section 15 – 1005 –        Is outside exercise provided?          YES_____NO__✓__N/A_____

\*   14 day (and under) facilities are exempt
\*   24 hour overnight facilities are exempt

XVI.   EXISTING FACILITIES:

| | | | |
|---|---|---|---|
| | Section 16 – 1004 – | Is lighting adequate? | YES ✓ NO____ N/A____ |
| | Section 16 – 1004 – | Is temperature maintained at a proper level? | YES ✓ NO____ N/A____ |
| | Section 16 – 1004 – | Is an automatic cut-in generator for emergency lighting and equipment provided? | YES ✓ NO____ N/A____ |
| | Section 16 – 1005 – | Are smoke and fire alarms present? | YES ✓ NO____ N/A____ |
| | Section 16 – 1006 – | Is there a cell that can be used to house the handicapped? | YES ✓ NO____ N/A____ |
| | Section 16 – 1007 – | Are there at least two exits from each housing area? | YES ✓ NO____ N/A____ |
| | Section 16 – 1008 – | Is there a proper booking area located inside the secure area? | YES ✓ NO____ N/A____ |
| | Section 16 – 1009 – | Is there an alcohol unit? | YES ✓ NO____ N/A____ |
| ** | Section 16 – 1010 – | Do cells meet general housing requirements? | YES ✓ NO____ N/A____ |
| * ** | Section 16 – 1011 – 1012 – | Do the cells meet the footage requirement? | YES ✓ NO____ N/A____ |
| | Section 16 – 1013 – | Is there an observation cell? | YES ✓ NO____ N/A____ |
| * ** | Section 16 – 1014 – | Will activity rooms meet requirements? | YES ✓ NO____ N/A____ |
| | Section 16 – 1015 – | Is there proper storage space for bedding and clothing? | YES ✓ NO____ N/A____ |
| * ** | Section 16 – 1016 – | Are indoor or outdoor exercise areas provided? | YES____ NO ✓ N/A____ |
| | Section 16 – 1017 – | Is there adequate storage space for security equipment and cleaning supplies? | YES ✓ NO____ N/A____ |
| | Section 16 – 1018 – | Is adequate space provided for administrative and staff functions? | YES ✓ NO____ N/A____ |
| | Section 16 – 1019 – | Is there adequate space provided for food preparation and handling? | YES ✓ NO____ N/A____ |
| | Section 16 – 1020 – | Is there a proper visiting area? | YES ✓ NO____ N/A____ |

*   14 day (and under) facilities are exempt
**  24 hour overnight facilities are exempt

6

INSPECTION DATE: _14 MAR 07_    INITIAL INSPECTION OR RE-INSPECTION _INITIAL_

INSPECTION TIME SHIFT:  FIRST ___✓___    SECOND _____    THIRD _____

RE-INSPECTION REQUIRED:  YES _____    NO __✓___    SIGNED _____

MAILINGS SENT:  COUNTY JUDGE ___✓___    COUNTY CLERK __✓___

SHERIFF ___✓___    QUORUM COURT __✓___

CHIEF OF POLICE _____    MAYOR _____    CITY COUNCIL _____

CIRCUIT JUDGE ___✓___

ANY ACTION REQUIRED IN IMMEDIATE NON-COMPLIANCE?  YES _____ NO _✓_

DIRECTOR'S HELP REQUIRED?  YES _____ NO __✓__

LIST REASONS FOR  (NO AND N/A)

| SECTION NO. | NO or N/A | REASON |
|---|---|---|
| 4-1002-H/9-1001-A | NO | Insufficient staff to man shifts properly and to provide adequate security for staff and inmates |
| 10-1002 | No | Jail has a nice medical infirmery but No personnel to staff or use it. |
| 15-1005/16-1016 | No | Jail has outside exercise area, but Lack of Staff precludes its use |

NOTE! inmate population 14 MAR 07: 64

NOTE: IT appears to the Committee that this jail is understaffed. IN Addition to above Comments, the Lepper Control Center was Not Manned, The inmate population is limited to 60 inmates due to lack of Staff (this is Less than 50% Capacity). ~~was~~ The Committee was told that the jail needs 4 to 5 more employees per shift.

The Committee encourages the County to conduct a Manpower Study of this Jail's Staffing.

OFFICIAL

DETENTION FACILITY COMPLIANCE REPORT

SEP 1 3 2006

NAME OF FACILITY _Saline Co Jail_

ADDRESS _735 S. Neeley St, Benton, Ar 72015_

COUNTY JUDGE OR MAYOR _Lanny Fite_

FACILITY SUPERVISOR _Lt. Hugh Gentry_                    501-303-5609

PERSON INTERVIEWED _SAB_     FACILITY PHONE _501-303-5603_

SHERIFF OR CHIEF OF POLICE _Phil Mask_     TITLE _Jail Admin._

LOCATION OF JAIL _SAB_

DATE OF CONSTRUCTION _2006_     DATE REMODELED ____

CELL DESIGN _On File_     Pop- 9-10-08 - 155     20 Females

MAXIMUM CAPACITY _183_     4 - 30°

1 MAN____ SIZE____X____ SQ. FT.____     ____ SIZE____X____ SQ. FT.____

2 MAN____ SIZE____X____ SQ. FT.____     ____ SIZE____X____ SQ. FT.____

3 MAN____ SIZE____X____ SQ. FT.____     ____ SIZE____X____ SQ. FT.____

4 MAN____ SIZE____X____ SQ. FT.____     ____ SIZE____X____ SQ. FT.____

HOW MANY PAID PERSONNEL (JAILORS & MATRONS) ARE ASSIGNED DUTIES IN THE JAIL?____

Supervisors _4_     Full Time Males _12_     Full Time Females _12_

Part Time Males____     Part Time Females____

[Attached]

WHAT IS THE SHIFT FORMULA?

_5 AM_ TO _5 PM_     _5 PM_ TO _5 AM_     ____ TO ____

HOW MANY PERSONNEL TO EACH SHIFT INCLUDING SUPERVISORS? _6 & 6_

Sign _Melba Shepard_     Inspection Date _Sept. 10 - 08_
     Committee Member

Sign _____     Sign _____
     Committee Member          Committee Member

Sign _James Moury_     Sign _Chas S. ___
     Committee Member          Committee Chairman

Sign _____     Sign _Lt Hugh Gentry_
     Committee Member          Person Interviewed

Plaintiff's Exhibit 2

STATE OF ARKANSAS
ADULT DETENTION FACILITIES

DETENTION FACILITY _Saline Co. Jail_                    DATE OF INSPECTION _9-10-08_

All Adult Detention Facilities in Arkansas must comply with all applicable mandatory requirements.  Failure to meet applicable requirements will cause the facility to be considered in non-compliance and subject to further action by this Agency in compliance with Act 530 of 1985 – Section 4.

<u>MINIMUM MANDATORY REQUIREMENTS</u>                                        <u>IN COMPLIANCE</u>

III.  ADMINISTRATION:

Does the Facility's operations comply with requirements as stated in Chapter III relative to the following:

| Section 3 – 1004 – | Written Policy | YES____ NO____ N/A____ |
| Section 3 – 1005 – | Budget | YES____ NO____ N/A____ |

IV.  PERSONNEL:

Does the facility meet personnel requirements as stated in Chapter IV relative to the following:

| Section 4 – 1002 – A – B – C – D | Personnel file with required records. | YES____ NO____ N/A____ |
| Section 4 – 1002 – E | Has each employee completed the basic jail course? | YES____ NO____ N/A____ |
| Section 4 – 1002 – H | Does the facility have sufficient personnel? | YES____ NO____ N/A____ |
|  | If not, has the administrator requested such in writing? | YES____ NO____ NA____ |

V.  RECORD SYSTEM:

Does the facility maintain a minimum record system in compliance with Chapter V relative to the following:

| Section 5 – 1002 – | Are proper papers for commitment being maintained? | YES____ NO____ N/A____ |
| Section 5 – 1003 – | Is a proper jail log or detention record being kept? | YES____ NO____ N/A____ |

1

## V.  RECORD SYSTEM:  Continued

Section 5 – 1004 –     Is confinement information being gathered on each inmate?

YES ✓  NO____  N/A____

Section 5 – 1005 –     Is prisoner's personal property being handled properly?

YES ✓  NO____  N/A____

Section 5 – 1006 –     Are proper medical records being kept relating condition of prisoner at intake?

YES ✓  NO____  N/A____

Section 5 – 1007 –     Does the facility have a written policy on strip searches?

YES ✓  NO____  N/A____

Section 5 – 1008 –     Is a copy of the jail rules provided to the prisoner?

YES ✓  NO____  N/A____

Section 5 – 1010 –     Are disciplinary actions recorded in writing?

YES ✓  NO____  N/A____

Section 5 – 1011 –     Is there a written record of unusual occurrences?

YES ✓  NO____  N/A____

## VI.  RIGHTS OF ACCUSED IN CUSTODY:

Section 6 – 1001 –     Are inmate rights posted and is a copy furnished them?

YES ✓  NO____  N/A____

Section 6 – 1002 –     Do inmate rights contain provisions A thru G?

YES ✓  NO____  N/A____

Section 6 – 1003 –     Does written policy for disciplinary actions provide for requirements A thru D?

YES ✓  NO____  N/A____

## VII.  RULES OF CONDUCT FOR PERSONNEL:

Section 7 – 1001 –
        1002 –        Does facility policy and procedures manual provide for requirements listed in these sections?

YES ✓  NO____  N/A____

## VIII.  PRISONER SEPARATION:

Section 8 – 1001 –     Does the facility provide complete separation of females from the area where males are confined?

YES ✓  NO____  N/A____

Section 8 – 1001 –     Are juveniles, charged as adults, separated from the rest of the inmates?

YES ✓  NO____  N/A____

2

VIII.   PRISONER SEPARATION    continued

| Section 8 – 1001 – | Are youthful offenders under age 18, who are under The Jurisdiction of The Juvenile Court incarcerated? | YES_____ NO__✓__ N/A__ |

| Section 8 – 1001 – | If so, are they completely separated from the rest of the jail population? | YES_____ NO_____ N/A__ |

| Section 8 – 1001 – | Are prisoners being separated by class? | YES__✓_ NO_____ N/A_____ |

| Section 8 – 1002 – | Are work release and trusty prisoners separated from other prisoners? | YES__✓_ NO_____ N/A_____ |

IX.   SECURITY:

Does the facility's security procedures and practices comply with minimum requirements as stated in Chapter IX relative to the following:

| Section 9 – 1001 – A | Does the facility have sufficient personnel on duty at all times? | YES_____ NO__✓__ N/A_____ |

| Section 9 – 1001 – A – B – | Are proper cell checks being made and recorded? | YES__✓_ NO_____ N/A_____ |

| Section 9 – 1001 – C | Are female officers on duty when females are incarcerated? | YES__✓_ NO_____ N/A_____ |

| Section 9 – 1001 – D | Does the policy manual have a search procedure for control of contraband? | YES__✓_ NO_____ N/A_____ |

| Section 9 – 1002 – E | Does the policy manual have a procedure for emergency situations which includes what to do in case of fire, escapes, riots, smoke situations, inmate disturbances and assaults? | YES__✓_ NO_____ N/A_____ |

| Section 9 – 1002 – G | Are officer's weapons removed before entering secure area? | YES__✓_ NO_____ N/A_____ |

| Section 9 – 1002 – I | Does the facility have a policy for key control? | YES__✓_ NO_____ N/A_____ |

| Section 9 – 1002 – J | Does the facility have a written policy addressing security measures for trusty-status inmates? | YES_____ NO_____ N/A_____ |

3

X. MEDICAL, DENTAL AND MENTAL HEALTH CARE:

Section 10 – 1001 –    Does the facility have a medical and dental plan in writing and on file to insure that medical services or practices are available to all those in custody?    YES ✓  NO____  N/A____

Section 10 – 1002 –    If medical care is provided at the facility, is proper space provided?  /SEM/    YES____  NO____  N/A ✓

Section 10 – 1003 –    Does the facility have an emergency and sick call procedure?    YES ✓  NO____  N/A____

Section 10 – 1004 –    Are written records of inmate's medical and dental complaints being kept?  Does this record include results of the health encounter?    YES ✓  NO____  N/A____

Section 10 – 1005 –    Are records kept of medicine prescribed and administered?    YES ✓  NO____  N/A____

Section 10 – 1005 –    Is medicine kept in a secure area?    YES ✓  NO____  N/A____

Section 10 – 1009 –    Is there a medical training program such as C.P.R. and first aid or a suitable alternative?    YES ✓  NO____  N/A____

XI. MAIL, COMMUNICATIONS AND VISITING:

Does the facility comply with minimum requirements regarding privileges as stated in Chapter XI relative to the following:

Section 11 – 1001 –    Rules for visiting?    YES ✓  NO____  N/A____

Section 11 – 1002 –    Is a visitor's log kept?    YES ✓  NO____  N/A____

Section 11 – 1005 – thru 11 – 1009 –    Is there a written policy for correspondence and incoming mail?    YES ✓  NO____  N/A____

Section 11 – 1010 –    Is there a written policy for use of the phone and are prisoner's calls logged where necessary?    YES ✓  NO____  N/A____

XII. FOOD SERVICE:

Section 12 – 1001 –    Are meals being served as required?    YES ✓  NO____  N/A____

XII.  FOOD SERVICE:  continued

\* Section 12 – 1001 –   Are menus approved by a dietician?   YES____ NO____ N/A____

Section 12 – 1002 –   Are records being kept of the food actually served?   YES____ NO____ N/A____

Section 12 – 1003 –   Has kitchen been inspected by Health Department?   YES____ NO____ N/A____

Section 12 – 1006 –   Is garbage removed from the cells immediately after eating?   YES____ NO____ N/A____

\*  24 hour overnight facilities are exempt

XIV.  SAFETY:

Section 14 – 1002 –   Has the facility been inspected by local fire department in the past year?   YES____ NO____ N/A____

Section 14 – 1003 –   Does the facility have a written fire plan and is personnel familiar with it?   YES____ NO____ N/A____

Section 14 – 1004 –   Does the facility have a written plan for all other emergencies and are evacuation procedures detailed?   YES____ NO____ N/A____

Section 14 – 1005 –   Are exits plainly marked?   YES____ NO____ N/A____

Section 14 – 1006 –   Are cleaning fuids, toxic and caustic materials stored properly?   YES____ NO____ N/A____

Section 14 – 1008 –   Does the facility have up to date fire fighting equipment and access to a compressed air breathing apparatus?   YES____ NO____ N/A____

XV.  INMATE SERVICES:

\* Section 15 – 1002 –   Does the facility have a written policy to provide recreation and leisure time activities, library services, social and religious services?   YES____ NO____ N/A____

\* Section 15 – 1005 –   Is outside exercise provided?   YES____ NO____ N/A____

\*  14 day (and under) facilities are exempt
\*  24 hour overnight facilities are exempt

XVI.    EXISTING FACILITIES

| Section 16 – 1004 – | Is lighting adequate? | YES ___ NO ___ N/A ___ |
|---|---|---|
| Section 16 – 1004 – | Is temperature maintained at a proper level? | YES ___ NO ___ N/A ___ |
| Section 16 – 1004 – | Is an automatic cut-in generator for emergency lighting and equipment provided? | YES ___ NO ___ N/A ___ |
| Section 16 – 1005 – | Are smoke and fire alarms present? | YES ___ NO ___ N/A ___ |
| Section 16 – 1006 – | Is there a cell that can be used to house the handicapped? | YES ___ NO ___ N/A ___ |
| Section 16 – 1007 – | Are there at least two exits from each housing area? | YES ___ NO ___ N/A ___ |
| Section 16 – 1008 – | Is there a proper booking area located inside the secure area? | YES ___ NO ___ N/A ___ |
| Section 16 – 1009 – | Is there an alcohol unit? | YES ___ NO ___ N/A ___ |
| ** Section 16 – 1010 – | Do cells meet general housing requirements? | YES ___ NO ___ N/A ___ |
| * ** Section 16 – 1011 – 1012 – | Do the cells meet the footage requirement? | YES ___ NO ___ N/A ___ |
| Section 16 – 1013 – | Is there an observation cell? | YES ___ NO ___ N/A ___ |
| * ** Section 16 – 1014 – | Will activity rooms meet requirements? | YES ___ NO ___ N/A ___ |
| Section 16 – 1015 – | Is there proper storage space for bedding and clothing? | YES ___ NO ___ N/A ___ |
| * ** Section 16 – 1016 – | Are indoor or outdoor exercise areas provided? | YES ___ NO ___ N/A ___ |
| Section 16 – 1017 – | Is there adequate storage space for security equipment and cleaning supplies? | YES ___ NO ___ N/A ___ |
| Section 16 – 1018 – | Is adequate space provided for administrative and staff functions? | YES ___ NO ___ N/A ___ |
| Section 16 – 1019 – | Is there adequate space provided for food preparation and handling? | YES ___ NO ___ N/A ___ |
| Section 16 – 1020 – | Is there a proper visiting area? | YES ___ NO ___ N/A ___ |

*  14 day (and under) facilities are exempt
** 24 hour overnight facilities are exempt

6

INSPECTION DATE: 9-10-8  (INITIAL INSPECTION OF RE-INSPECTION _INITIAL_

INSPECTION TIME SHIFT: FIRST_____ SECOND_____ THIRD_____

RE-INSPECTION REQUIRED: YES_____ NO ✓_____ SIGNED_____

MAILINGS SENT: COUNTY JUDGE ✓_____ COUNTY CLERK ✓_____

SHERIFF ✓_____ QUORUM COURT ✓_____

CHIEF OF POLICE_____ MAYOR_____ CITY COUNCIL_____

CIRCUIT JUDGE ✓_____

ANY ACTION REQUIRED IN IMMEDIATE NON-COMPLIANCE? YES_____ NO ✓

DIRECTOR'S HELP REQUIRED? YES_____ NO ✓

LIST REASONS FOR  (NO AND N/A)

| SECTION NO. | NO or N/A | REASON |
|---|---|---|
| 4-1002-H/9-1001-A | NO | Insufficient staff to man shifts properly and to provide adequate security for staff & inmates |
| 10-1002 | NO | Jail has nice med. infirmary but no personnel to staff or use it |
| 15-1005/16-1016 | NO | Jail has outside exercise area, but lack of staff precludes its use. |

Note: Population 9-10-08 = 135 males
                                       20 females

This Jail is badly understaffed !

## ADMINISTRATION

(1)LT HUGH GENTRY (JAIL ADMINISTRATOR)
(2)SGT DRU REED (ASSISTANT JAIL ADMIN/ JAILER)
(3)SGT RAY PENNINGTON(ASSISTANT JAIL ADMIN/TRANSPORT)

**3**

## TRANSPORT

(4)BILLY HOOLAPA (COURTS OFFICER/ TRANSPORT ONLY)
(5)BRANDON FORD (COURTS OFFICER/ TRANSPORT ONLY)
(6)OFFICER JIMMY LESTER  (COURTS OFFICER TRANSPORT ONLY)

**3**

## SHIFT SUPERVISORS

(7) CPL. CHRISTY LOBBS
(8) CPL CHAD WESTBROOK (JAILER/ SHIFT SUPERVISOR)
(9) CPL VICKY CLARK (JAILER/ SHIFT SUPERVISOR)
(10) CPL KERI SESSIONS

**4**

## MEN  (JAILERS)

(11) RYAN MCKINNEY
(12) GLEN FAULKNER
(13) **DAVID GREEN**                    **ASSIGNED TO KITCHEN** only
(14) CHRISTOPHER MAHER
(15) ULENZEN KING
(16) **FREDDY WISE**                     **ASSIGNED TO KITCHEN** only
(17) KENNETH DURHAM
(18)  ALLEN LEECH
(19) JAMES HART
(20) DOMINICK MARANGONI
(21) CALVIN REED
(22) JONATHON CALMA

**12**

## FEMALES (JAILERS)

(23) RUTH SHILLING
(24) JILL ERWIN
(25) DEBRA NICHOSI
(26) JACLYN LOBBS
(27) MELISSA HOLCOMBE
(28) LISA TODD
(29) TAMMY PENDIGRASS
(30) PHYLLIS HARRELSON
(31) BRANDI PINTO
(32) ERICKA JONES
(33) BRITTNEY TODD
(34) SHARA SIEVERS

**12**

## MEDICAL

(NURSE VACANT)
(DOCTOR VACANT)

**0**

1 man cells __8__ size
$$7^{ft} \times 11.5^{ft} = \text{sqft } \underline{80.5}$$
$$8 \times 8.75^{ft} = \text{sqft } \underline{68.0}$$
$$8.75 \times 8.75^{ft} = \text{sqft } \underline{76.56}$$

2 man cells __30__ size $7^{ft} \times 12.5^{ft} = \text{sqft } \underline{87.5}$

3 man cells __1__ size $12.25 \times 15.5^{ft} = \text{sqft } \underline{189.88}$

4 man cells __4__ size
$$11.5^{ft} \times 15^{ft} = \text{sqft } \underline{172.50}$$
$$16.5^{ft} \times 16^{ft} = \text{sqft } \underline{264.0}$$
$$8.75^{ft} \times 21^{ft} = \text{sqft } \underline{183.75}$$

22 man Dorm - two level



1 man cells __8__ size

$7^{ft} \times 11.5^{ft} = $ SqFt __80.5__
$8^{ft} \times 8.75^{ft} = $ SqFt __68.0__
$8.75 \times 8.75^{ft} = $ SqFt __76.56__

2 man cells __30__ size $7^{ft} \times 12.5^{ft} = $ SqFt __87.5__

3 man cells __1__ size $12.25^{ft} \times 15.5^{ft} = $ SqFt __189.88__

4 man cells __4__ size
$11.5^{ft} \times 15^{ft} = $ SqFt __172.50__
$16.5^{ft} \times 16^{ft} = $ SqFt __264.0__
$8.75 \times 21^{ft} = $ SqFt __183.75__

22 man Dorm - two level





# COURIER

SALINE COUNTY'S NEWS SOURCE SINCE 1876

Benton, Arkansas

Benton, Arkansas
Currently
Passing clouds. Hot.
88°
Click for Forecast
Award Winning.
Saturday, June 27, 2009

**Home   News   Sports   Classifieds   Obituaries**

Search Archive
search...
Submit

News
- Home
- Local News
- National News
- Business
- Horoscopes
- Obituaries
- Opinions/Editorials
- Features
- Recipe of the Day
- Weather
- Sudoku
- Entertainment
Sports
- Local Sports
- National Sports
- Razorbacks



Click HERE to See and Buy Photos

Classifieds
- Place An Ad
- Classifieds
Service Directory
Make Us Your Homepage
The Benton Courier
- About Us
- Contact Us
- Subscribe
- Send Letter To Editor
- Announcement Forms



Click HERE to See and Buy Photos

Get Stock Quotes
Enter Symbol:

Get Quote

## County jail physician is let go; costs cited
Wednesday, 27 August 2008

The Saline County jail is back to square one with medical care.

Only three months into the contract, the county decided to terminate its contract with Dr. Marvin Kirk of Benton, who was hired as jail medical director in May at a cost of $36,000 annually.

"It was nothing that (Kirk) did that caused us to terminate the contract," County Judge Lanny Fite said. "We let him go under the contract because the jail nurse quit and that was an integral part of the whole system."

Fite said the county has had a "difficult time" trying to find a new nurse. One reason, he said, is that a jail setting has proved difficult in attracting employment.

"We didn't get input from (Sheriff Phil Mask) in this. We decided since we had a difficult time hiring the nurse and then we lost her, we decided to go ahead and terminate the doctor and go ahead and take inmates to the emergency room again."

Toni James was hired as the detention center nurse in the spring and quit in June, reportedly for personal reasons. When contacted by the Courier, James said she hasn't worked at the jail for a while and did not want to comment.

According to letters from jail inmates, James allegedly was being asked to do things that could have resulted in the loss of her nurse's license. However, Sheriff's Capt. Scotty Courtney said that "at no time did we ask her to do anything that would cause her to lose her license."

The nurse was hired to work full-time at the jail, while Kirk was at the detention center two days a week. He was on call 24 hours a day, however.

Fite said the county has decided "to let the new sheriff administration come in and let them make decisions" related to the medical staff.

Justice of the Peace Sharon Riggan of Benton, co-chairman of the Jail Committee, said she expects a committee meeting to be held in September to discuss the handling of medical issues through the first of the year.

Cat-scans and other common lab work can cost the county around $5,000. Riggan said Saline Memorial Hospital in Benton has agreed to give the county a 25 percent discount until the medical issues are resolved.

"We can't refuse (inmates) medical treatment," Riggan said. She added that a doctor on staff decreased the number of hospital visits, but the county saw an increase in medication costs.

JP J.R. Walters of Alexander, co-chairman of the Jail Committee, said before the doctor came on board, medication bills totaled approximately $2,000 to $3,000 a month. In the summer months, with Kirk on staff, medication bills were approximately $14,000 a month.

Walters said the committee is discussing the possibility of hiring a "qualified jail administrator" at the first of the year.

Courtney said that while the sheriff's office would like to see a nurse and doctor "right now," the jail staff will continue doing what it practiced before medical professionals were hired.

"We're back to the where anytime anybody needs medical attention, we have to take them to the emergency room or doctor," Courney said. "The emergency room is our doctor."

He added that "jailers have to pass out meds until we get these two positions replaced."

Having a nurse and doctor on staff would "alleviate distress on jailers and they could concentrate on inmates, what they're hired to do and not the medical side, which they are not trained for," Courtney said. "It's unfortunate we can't have (medical staff) right now, but we'll buckle down and do the best job we can with the resources we have," he said.

Whether the jail has failed to provide medical treatment to inmates will be up to the courts. The county has seven lawsuits against it at this time, County Attorney Jonathan Greer said.

"Of the seven cases pending, all are against the jail," he said, noting that "three of them are for improper medical treatment."

"The county will vigorously defend these cases," Greer said.

As a member of Central Arkansas Risk Management Association, the county will hire a CARMA attorney to defend the county. Most of the cases are tried in federal court because the plaintiffs are alleging a constitutional violation, Greer said.

Greer added that Saline County is not alone in these lawsuits, noting that it's not uncommon for inmates to sue the counties in which they are incarcerated.





**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

ELAINE THOMPSON, INDIVIDUALLY AND                    PLAINTIFFS
AS PERSONAL REPRESENTATIVE OF THE ESTATE
OF JOHNNY DALE THOMPSON, JR., DECEASED

v.                              NO. 4:11-CV-0379BSM

SALINE COUNTY SHERIFF PHIL MASK, INDIVIDUALLY AND
AS FORMER SHERIFF OF SALINE COUNTY, ARKANSAS;
SHERIFF BRUCE PENNINGTON, INDIVIDUALLY AND
AS SUCCESSOR AND CURRENT SHERIFF OF SALINE COUNTY, ARKANSAS;
HUGH GENTRY, INDIVIDUALLY AND AS JAIL ADMINISTRATOR
FOR ADULT DETENTION FOR SALINE COUNTY, ARKANSAS;
RAY PENNINGTON, INDIVIDUALLY AND AS SUCCESSOR
JAIL ADMINISTRATOR FOR ADULT DETENTION FOR
SALINE COUNTY, ARKANSAS;
TAMMY PENDERGRASS, INDIVIDUALLY AND AS CORPORAL FOR THE
SALINE COUNTY SHERIFF'S DEPARTMENT;
MIKE FROST, INDIVIDUALLY AND AS A LIEUTENANT FOR SALINE
COUNTY SHERIFF'S DEPARTMENT;
ED BUSH, INDIVIDUALLY AND AS SERGEANT FOR SALINE COUNTY
SHERIFF'S DEPARTMENT;
ULENZEN C. KING, INDIVIDUALLY AND AS A FORMER
OFFICER FOR THE SALINE COUNTY DETENTION CENTER;
STEPHEN FURR, INDIVIDUALLY AND AS AN DEPUTY OF THE
SALINE COUNTY SHERIFF'S DEPARTMENT;
JAMES HALL, INDIVIDUALLY AND AS AN DEPUTY OF THE SALINE
COUNTY SHERIFF'S DEPARTMENT; and
SALINE COUNTY ARKANSAS                          DEFENDANTS

## <u>AFFIDAVIT OF BOBBY D. HARRISON</u>

I, Bobby D. Harrison, residing at 12303 Sumners Cemetary, Cabot, Arkansas; telephone

number 501-519-3851;  hereby swear and affirm that I have personal knowledge of the foregoing

facts:

1. I was in the Saline County Jail on the evening of December 18th, 2008.

2. I saw a person, later identified to me to be Johnny Dale Thompson, Jr., enter the jail.

3. Mr. Thompson was obviously messed up on drugs, leaning and falling out of a chair the



jailer sat him in, and he couldn't even answer questions that Officer King was asking him.

4.  Officer King and some jail trustees were slapping the counter tops to get Mr. Thompson's attention but Mr. Thompson was unable to talk very well and was mumbling.

5.  Officer King put Mr. Thompson in a jail cell.

6.  I heard Mr. Thompson sliding down the glass window of his jail cell and Officer King then went over to Mr. Thompson jail cell, like he was going to do something to help Mr. Thompson.. I heard Mr. Thompson say, "I need to go somewhere," and then I heard nothing else.  Officer King did not do anything and left Mr. Thompson in the jail cell.

7.  I knew, and anyone else who saw his condition would have known, that that Mr. Thompson had a serious medical need and that he needed medical attention.

8.  I told Officer King that Mr. Thompson needed medical help.

9.  I yelled at Officer King through my cell door that Mr. Thompson needs help, but Officer King would not acknowledge my communications.

10.  I saw and heard the jailers in the jail laughing after they knew Mr. Thompson was dead.

11.  I was very upset and terrified by the conduct of Officer King and the jailers on duty after I observed them ignore Mr. Thompson'sobvious need for medical attention for an obvious serious medical condition, ignore my pleas for them to help him, then the joking and laughing about Mr. Thompson's death, and other statements I heard a detective and others state as I explained in my statements to the Saline County Sheriff's Office and later to the Arkansas State Police, which are attached hereto as **Exhibits 1, 2, and 3**.

12.  I called my mother as soon as I could to tell her about the incident, to express how upset I was to her about this matter, and tell her my fear caused by the hostile, dangerous, and

indifferent attitudes the jailers and jail personnel while I stayed in that jail.

13.  Officer King and every jailer I saw appeared to be deliberately indifferent to Mr. Thompson's serious medical need and to his death.

14.  After Mr. Thompson's death, I was asked by an employee of the Saline County Sheriff's Office to write out my statement about what happened and sign the same, a copy of which is attached to my affidavit as **Exhibit "1"** Then on December 30th, 2008, twelve days after Mr. Thompson's death, an Arkansas State Police Investigator came to me in the jail get my statement about what I had observed and my hand written statement and the state police typed up version of my statement, are attached to my affidavit as **Exhibits "2 & 3"**.

15.  The investigator specifically asked me whether I heard Mr. Thompson say he needed a doctor, and I wrote in my statement that I didn't hear him specifically ask for a doctor in response to the investigator's question.  However, Mr. Thompson's had an obviously serious medical problem after he entered the jail, which got progressively worse during the attempted interview by Officer King, it continued after he was locked in a cell, and I was yelling at Officer King that he needed help because it was obvious to me that Mr. Thompson needed a doctor.

**FURTHERMORE THE AFFIANT SAYETH NOT.**

**BOBBY D. HARRISON**

**State of Arkansas)**
                    )SS:
**County of Saline )**

**SUBSCRIBED AND SWORN TO before me, a Notary Public, on this** 15th **day of** _____, 2012

My Commission Expires: 1-20-2014

NOTARY PUBLIC

<u>Johnny Thompson</u>
Booked in at 7:30
9:20 p.m. Johnny Thompson died in holding cell 1 the guards were laughing and when C.I.D. arrived Det. Robertson cracked jokes about the guy saying He was stopped on a traffic violation for no tail lights And left out of here (saline county Jail) with no lights. When a person cant talk when he is brought in or tell how much they have had to drink or what drugs he had taken they are supposed to take them to the hospital and they didnt. He had An empty ⊗ XANAX bottle on him and was so messed up he couldnt even sit up straight in a chair, constantly in and out of consciousness.

Bobby Anderson

Bobby D. Harrison
w/m ████████
2043 Dean Martin Dr.
Cabot AR 72023
██████████ Hm
SSH ████████████
6'2" 162 lbs
Hazel/Brown

1230-08
11:47 am Beg
12:12 pm Ended

Benton, AR

I saw him come in and he was messed up.
He was leaning and falling out of his chair.
He couldn't even answer questions that
officer King was asking. King and the 309's
were slapping the counter to get his attention.
He couldn't talk very well and he was
mumbling. King put him in his cell. I
heard Thompson ~~sliding~~ down the glass of his
cell. King went back to his cell and I heard
Thompson say "I need to go somewhere." I
didn't here him say anything after that.
I didn't hear him say that he needed a doctor.
I told King that the guy needs help. I yeld
it through the door but, he didn't acknowledge
me. The jailers were laughing after the knew he was dead.

RSA Shane Foster #57     X Bobby HARRISon

76

# ARKANSAS STATE POLICE

ASP-3
(Rev. 09/00)

## Criminal Investigation Division
### Case Form

Date:            DECEMBER 30, 2008
Dictated by:     S/A SHANNON M. FONTENOT #51
Date Typed:      DECEMBER 31, 2008 **Proofed SW**
Copies to:       SHANNON FONTENOT

<u>INTERVIEW OF WITNESS</u>

BOBBY D. HARRISON
W/M DOB: ██████████
2043 Dean Martin Drive
Cabot, Arkansas 72023
Home Phone: ██████████

I interviewed BOBBY HARRISON at the Saline County Jail on December 30, 2008 at
11:47AM. A signed written statement was completed and will be made a part of this file.
An ASP-6B was also completed and will be attached and be made a part of this file. The
following is a summary of the interview:

HARRISON stated he saw JOHNNY THOMPSON enter the jail and that he appeared messed
up. He stated THOMPSON was falling out of his chair and he couldn't even answer
questions that Officer KING was asking him. KING and the 309s were slapping the counter
to get THOMPSON'S attention. HARRISON then stated THOMPSON couldn't talk very well
and he was mumbling. HARRISON stated KING then put THOMPSON in his cell. He then
stated he heard THOMPSON sliding down the glass of his cell. He said KING returned to
the cell and opened the door. HARRISON then said he heard THOMPSON say, "I need to go
somewhere". HARRISON stated he didn't hear him say anything after that and that he
didn't hear him say he needed a doctor. HARRISON then stated that he told KING to get
THOMPSON some help but KING didn't acknowledge him. HARRISON stated the jailers
were laughing after they knew THOMPSON was dead.

The interview was concluded at 12:12PM

FILE NUMBER: CID-A-03539-08                    CRIME: DEATH INVESTIGATION

Stephen A. Furr
303 Summerwood Dr.
Benton, AR 72019
~~Sunday~~
~~Clemens~~
4-2-83

I Made a stop on Red Chevy S-10 truck
and mr. Thompson was a passenger in the
back extended part of the cab. Mr. Thompson
had warrants from several departments including
our department. I had him exit the vehicle
and put his hands on the bed of his truck
Dep. Hall then patted him down and handcuffed
him. Hall then put his belongings and an
empty bottle in his cap. I then put the
taken items into an evidence bag. ~~He~~
Thompson fell asleep on the way to the jail.
I woke him up when we got to the jail.
He seemed to be slurring a little while
he was given instructions. I asked him
if he had taken any of his medication
and he said "yeah a little". After I

Plaintiff's Exhibit 6

80

completed his A.D.R. I told the jailer
I was finished with him a I left.
I returned about 1hr & 45min later
to assist Dep. Hall with a DWI arrest.
I then heard Jailer E. King say
"is he breathing?" an then Sgt. Bush
said call an ambulance.

x G/A Shannon Foster #57          + Dm /r #832



# ARKANSAS STATE POLICE

ASP-3
(Rev. 09/00)

## Criminal Investigation Division
## Case Form

Date:             DECEMBER 19, 2008
Dictated by:      S/A SHANNON M. FONTENOT #51
Date Typed:       DECEMBER 29, 2008 **Proofed SW**
Copies to:        SHANNON FONTENOT

<u>INTERVIEW OF WITNESS</u>

STEPHEN A. FURR
W/M DOB ███████████
303 Summerwood Dr.
Benton, Arkansas 72019
Cell Phone: ███████████
Work Phone: ███████████

I interviewed Deputy STEPHEN FURR on the date listed above at the Saline County
Sheriff's Office at 2:19PM. A signed written statement was taken will be made a part of this
file. An ASP-6B was also completed and will be attached and made a part of this file. The
following is a summary of the interview:

FURR stated he made a traffic stop on a vehicle in which JOHNNY THOMPSON was a
passenger. He stated after gathering identification from everyone in the car he learned
THOMPSON had several warrants for his arrest. FURR then stated he had THOMPSON exit
the vehicle and put his hands on the vehicle. FURR stated Deputy HALL then patted
THOMPSON down and handcuffed him. He then stated during the pat down HALL found an
empty bottle of Xanex in his front pocket. The bottle was prescribed to THOMPSON. FURR
stated the prescription was issued two days before his encounter for sixty pills. FURR then
stated he put all of THOMPSON'S belongings into an evidence bag and transported him to
jail.

FURR stated that THOMPSON fell asleep during the drive to the jail and that he woke him
up when they reached the jail. After entering the jail FURR stated THOMPSON slurred his
speech a little while receiving instructions. FURR stated he asked THOMPSON if he had
taken any of his medication and that THOPSON'S response was "yeah a little". FURR
stated he finished his Arrest Disposition Report and turned him over to the jailer.

FURR stated he returned approximately 1 hour and 45 minutes later to assist Deputy HALL
with a DWI arrest. He then stated while in the BAC machine area he heard Jailer KING ask
if THOMPSON was breathing and then he heard Sergeant ED BUSH direct someone to call
an ambulance.

The interview was concluded at 2:19PM.

FILE NUMBER: CID-A-03539                    CRIME: DEATH INVESTIGATION



# Saline County
# Sheriff's Office

Arkansas



**HOME** **PRESS RELEASES** **SEX OFFENDERS** **INMATE ROSTER** **CONTACT US**

**SERVICES**

Administration

CID

Detention Center

- Inmate Roster

Explorer Program

FAQ

Patrol

Reserves

Search & Rescue

**Crime or Drug Tip HOTline**
**501-315-DRUG (3784)**
**or submit via email**

**Phone: 501-303-5609**
**(24 hours)**

**Fax: 501-303-5747**

**Email**          **Map**

735 South Neeley St
Benton, AR 72015

**Administrative Office**
**Hours:** M-F 8am - 4:30pm
**Phone:** 501-303-5609

## 05/21/2012

### *Detention Officers Save Life*

Saline County Detention Officers found a detainee unconscious and unresponsive on May 21, 2012 at approximately 6:15 P.M.  Detention personnel began medical protocols and called for an ambulance.  An "AED" was attached to the detainee and used, it advised to begin CPR.  Detention Corporal M Murray, Detention Officer M Gates and Detention Officer P Finney began CPR and continued until medical personnel arrived.  The detainee had a pulse and respirations at the time Benton Fire Department and Med-Tran arrived.  The detainee was transported to the hospital and is in fair condition at this time.

This is the fourth detainee to receive life saving assistance from Detention Personnel at the Saline County Detention Center in the last four months.  The quick response of the Detention Officers, Benton Fire Department, and Med-Tran are to be commended in the saving of this detainee's life.  This is the type of interdepartmental cooperation that provides the best services to the citizens of Saline County.





04/02/2012

*Detention Medical Program*
**Press Release**

| | |
|---|---|
| **Date:** | **April 2, 2012** |
| **Re:** | **Detention Center Medical** |
| **From:** | **Sheriff Bruce Pennington** |

As Sheriff, I am well aware of the numerous issues that are faced with the operation of a Detention Facility. All County jails have the inevitable problem of safely housing inmates while also protecting the Sheriff's Office and the public from frivolous lawsuits. During the working stage of obtaining a healthcare program, our County Attorney advised us that nearly 80% of our lawsuits involve inmate healthcare issues.

Inmate medical bills and prescriptions are the biggest financial burden facing our Detention Center. When an inmate complains of some type of illness or injury, we have to send them to the doctor to ensure the inmate does not have any type of critical health situation. It takes additional unallocated manpower to take inmates back and forth to the doctor. If the inmate is admitted to the hospital, we then have to provide around the clock security. All of these occurrences are very costly to the county and the tax payers.

We have been working diligently with Judge Lanny Fite and the Quorum Court since November of 2011, to retain a professional healthcare program for the Detention Facility. I would like to announce that we have now signed a contract with Advanced Correctional Healthcare to provide the healthcare needed in our Detention Facility. This program is expected to be fully functioning by mid-May.

These are a few of the key points of the healthcare program.

1. Physician Services
    1. Physician on call 24/7
    2. Weekly sick call
    3. All prescriptions will be written by the doctor
    4. Pre-employment physicals will be covered under this program

Nurse Staffing
    1. Sick call screenings
    2. Medication management
    3. Medical records will be HIPPA compliant

In house examinations
    1.
        1. The company has equipment such as x-ray equipment, lab equipment and more that will save us from having to take the inmate to the hospital.

There are so many more services that it is not possible to list them all. One of the key elements of this healthcare service is that Advanced Correctional Healthcare assumes all responsibilities for lawsuits involving medical incidents. During Advanced Correctional Healthcare's presentation, a quorum court member asked if they had been sued. The



representative stated that they have been sued but have never lost a single case and went on to add that in some instances they have countersued and won the cases.

This program is a win/win for Saline County.  We will have the medical professionals at the jail to properly triage patients and that will drop the rate of inmates filing for false medical services.  It will also provide the lifesaving capabilities for those inmates who go into some type of full medical duress situations.  This will save the tax payers of Saline County money from medical expenses and will also protect against lawsuits.

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

ELAINE THOMPSON, INDIVIDUALLY AND                                      PLAINTIFFS
AS PERSONAL REPRESENTATIVE OF THE ESTATE
OF JOHNNY DALE THOMPSON, JR., DECEASED

v.                                    NO. 4:11-CV-0379BSM

SALINE COUNTY SHERIFF PHIL MASK, INDIVIDUALLY AND
AS FORMER SHERIFF OF SALINE COUNTY, ARKANSAS; et al          DEFENDANTS

<u>**AFFIDAVIT OF JEFF MCLAIN**</u>

I, JEFF MCLAIN, currently employed as a paramedic with MEDTRAN ambulance service located at Saline County Memorial Hospital, Benton, Arkansas; hereby swear and affirm that I have personal knowledge of the foregoing facts:

1. I completed and signed the report, which attached as <u>**Exhibit 1**</u> to this affidavit, in the ordinary course of business and my duties during my employment as a paramedic with MEDTRAN Ambulance Service; the information contained in the report accurately states what I personally heard, observed, and actions described therein that I personally performed. I was in the Saline County Jail on the evening of December 18th, 2008, after being dispatched in response to a 911 emergency call.

2. On December 18th, 2008, I was the paramedic on board the ambulance that was dispatched to the Saline County Jail in response to a 911 emergency call.

3. Upon my arrival I observed a Benton Fire Department Rescue employee performing attempted life saving measures, including coronary pulmonary resuscitation ("CPR"), on a person in a jail cell, later identified to me to be Johnny Dale Thompson, Jr.

4. In an effort to immediately determine facts, while I was also performing life saving measures with Benton Rescue during this excited state of medical emergency, the Benton Rescue



employee told me that jail staff had not performed any CPR on Mr. Thompson. I reported these facts in my report two times, on page one and page two of my attached report.

5. I took over the CPR procedure from Benton Rescue and performed all the other life-saving measures described in my report, and the MEDTRAN CHARGE SHEET attached to my report, both at the jail and I continued the same during Mr. Thompson's ambulance transport to Saline Memorial Hospital.

**FURTHERMORE THE AFFIANT SAYETH NOT.**

/s/ Jeff McClain
**JEFF MCLAIN**

**State of Arkansas**   )
               )SS:
**County of Saline**     )

**SUBSCRIBED AND SWORN TO before me, a Notary Public, on this** 29th **day of** May , **2012**

My Commission Expires: 1-20-2014

_Ranee Glidden_
NOTARY PUBLIC

**MEDTRAN    Paramedic Report    776-6002    Saline Memorial Hospital**

n#: _8176_    Date: _12-8-08_    Pt's Name: _Thompson Johnny_    Age: _28_    Sex: _M_

cation: _S Ready Saline County Jail_    Destination: _Shutter_

sponse: ☐ Non-Emergency ☒ Emergency ☐ Immediate  Transport: ☐ Non-Emergent ☒ Emergent  ALS Assessment: ☒ Yes ☐ N

dic: _McBain_    EMT: _Blackwell_    Medic: 1 ☒ 2 ☐ 3 ☐    District: 1 ☒ 2 ☐ 3

spatched: _2108_    En Route: _2108_    On Scene: _2113_    Trans: _2127_    Dest: _2131_    10-8: _2204_

ief Complaint: _Poss DOA or OverDose_

ene: _Called to FL & 911 call by staff Respond from Sned w/a 28 years_
_On Porch 1996 pt Pulseless + Apnea - CPR in progress by Benton Rescue_
_CM - Intubation - IV - Atropine - EPI in re Continue CPR - Atropine - EPI -_

story: A _Uk_    M _Uk_
_Uk_
_Uk_    F _Unwitnessed Arrest - pt Booked Apx 1830 And_
_Placed in cell - Jail staff Advised that was last time pt was seen_
_OR Spoken to- Benton Rescue Stated No CPR by Jail Staff_

al Signs: B/P _⊘_    Pulse-Rate/Quality: _⊘_    Resp-Rate/Effort/Breath Sounds _⊘_
_Uk_    Pupils: _4mm_    GCS Eyes _1_ Verbal _1_ Motor _1_    Skin: _Cool_
:AVPU _Unresponsive_    SMC'S _X⊘_    FSBS _NT_
:G Interpretation _Asystolic_    Medic Impression: _Code Blue_

s Weight: _80 kg_    kg HHENT: _⊘ DcapBT'S_

ck: _⊘ DcapBT'S_

est: _⊘ DcapBT'S_

domen: _⊘ DcapBT'S_

lvis/Posterior _⊘ DcapBT'S_

tremities: _⊘ DcapBT'S_

**Treatment**

way Control: _7.5 mm ET Tube_    Oxygen (Device & LPM): _15 LPM BVM_

: Site 1: _R AC_    Guage: _20_    Adm. Set: _10 GTTS_    Solution: _N/S_    Rate: _150 cc_    ☐ Yes ☒ No

: Site 2: _____    Guage: _____    Adm. Set: _____    Solution: _____    Rate: _____    ☐ Yes ☐ No

edication Administration:

ed: _____    Time: _____    Dose: _____    Route: _____    Protocol ☐ Dr.: 
ed: _SEE_    Time: _ARREST_    Dose: _RECORD_    Route: _____    Protocol ☐ Dr.: 
d: _____    Time: _____    Dose: _____    Route: _____    Protocol ☐ Dr.:

# MEDTRAN — Paramedic Report    776-6002    Saline Memorial Hospital

Run#: _____  Date: 12-18-08

Immobilization: None

Bandaging: _____

Other Treatment: C3 Transport Continue CPR

Changes: None

## Cardiac Arrest Record

CPR In Progress: Yes ☒  No ☐    Initial Cardiac Rhythm: Asystole

Intubation Time: _____    Attempt #: 1    Tube Size: 7.5    Patent: Yes ☒  No ☐

Intubation Confirmed by: ☒ Cord Visualization  ☒ Chest Rise  ☐ CO2 Detector  ☒ Breath Sounds  25 m    mm @ upper teeth/gums

| Medication/Strength | Time | Amt/Rt | Medication/Strength | Time | Amt/Rt |
|---|---|---|---|---|---|
| Atropine | 2120 | 1mg IV | | | |
| Eppi | 2123 | 1mg IV | | | |
| Atropine | 2128 | 1mg IV | | | |
| Eppi | 2131 | 1mg IV | | | |

| Time | Joules | Rhythm Before | Rhythm After | Time | Joules | Rhythm Before | Rhythm After |
|---|---|---|---|---|---|---|---|
| NO SHOCK | | | | | | | |

PULSE RESTORED:  Yes ☐  No ☒    What Rhythm: NO Change Asystole

AED Used:  Yes ☐  No ☒    Joule Setting: No shock

Comments/Personal Belongings: No CPR by Jail Staff According to Baxter Rescue —

Attached To Run Form on Back    Place EKG Strip Here

Outcome Smeter — Radio Report & Express PT To RM 1 PT Care Given to DR Amy Pittman  Crystal Rhone RN

**MEDTRAN**    Paramedic Report    776-6002    **Saline Memorial Hospital**

Run#_____    Date: 12-8-08

| PATIENT LAST NAME | FIRST | M.I. | PHONE | | DATE OF BIRTH | | |
|---|---|---|---|---|---|---|---|
| Thomas  Sharp | | | | | | AGE | GENDER |
| STREET ADDRESS  901  Sharp RD | | | SOCIAL SECURITY NUMBER  ▬ ▬ ▬ | | | | M |
| CITY  Benton | STATE  AR | ZIP CODE  72015 | INSURANCE CO. | | MILEAGE | IN | SUBTOTAL (Dest. to Station) |
| LEGAL GUARDIAN/NEXT OF KIN | PRIVATE PHYSICIAN | | MEDICAID # | | | DEST | SUBTOTAL (Dest. to Station) |
| BILL TO (COMPANY or NAME)  ○ Same as above | PHONE | | MEDICARE # | | | IN  DEST | SUBTOTAL (Dest. to Station) |
| ADDRESS | STREET | | GROUP INSURANCE # | | | IN  DEST | |
| CITY | STATE | ZIP CODE | OTHER INSURANCE # | | TOTAL MILES | 2 | |

---

**REASON FOR TRANSPORT-MEDICAL NECESSITY**

**DESCRIBE THE CIRCUMSTANCES NECESSITATING THE TRANSPORTATION: --**    **CHECK ALL APPLICABLE BOXES**

The patient was transported in an emergency situation, as a result of:

☒ 9900 Emergency situation, e.g., as a result of accident, injury or acute illness.
☐ 9901 Needed to be restrained
☐ 9902 Was unconscious or in shock
☐ 9903 Required oxygen or other emergency treatment
☐ 9904 Had to remain immobile because of a fracture that had not been set or the possibility of a fracture

9905 Sustained an acute stroke or myocardial infarction
9906 Was experience a sever hemorrhage
9907 Was bed confined before and after the ambulance trip. (Document the reason why the patient was confined)
9908 Could be moved only by stretcher. (Document the reason why the patient could only be moved by stretcher)

COMMENTS: (Info from P.C.R.) _____

Paramedic Signature: _____    Date 12-18-08

Patient Received NPP ☒ YES ☐ NO    Call Location (Zip Code) 72015

I, the undersigned, hereby authorize payment directly to **Saline Memorial Hospital** of the AMBULANCE benefits payable to me not to exceed the regular charges for this type of service. I understand, I am financially responsible to **Saline Memorial Hospital** for charges not covered by this authorization and do hereby guarantee payment of this bill within 15 days. I further agree that if collection is made by suit or otherwise, I agree to pay all collection costs including reasonable attorney fee. I hereby release said ambulance service, its owner and employees from any claim whatsoever. I also understand that Medicare will only pay for services that it determines to be reasonable and necessary. If medicare determines that a particular service thought it would be otherwise covered is not reasonable and necessary under Medicare standards that Medicare will deny payment for the service rendered and I hereby guarantee payment of this its entirety.
I hereby authorize the release of medical information and/or demographics to **Saline Memorial Hospital** from any medical provider, where the undersigned been a recipient of medical services. I hereby acknowledge that I have been provided with a copy of **Saline Memorial Hospital's** Notice of Privacy Practices as this date.

Date: 12-8-08    Signed: Unable to Sign    Witness: _____

**REFUSAL OF TREATMENT/TRANSPORT**

| | Date/Time |
|---|---|
| Patient Signature | |
| Witness | Date/Time |
| Witness | Date/Time |

This is to certify that I am refusing treatment/transport. I have been informed of the risk(s) involved, and hereby release the ambulance service, it attendants, and its affiliates, from all responsibility which my result from this action.

# Medtran Charge Sheet

Light Blue 35

| CODE | | | | | | |
|------|---|---|---|---|---|---|
| 2900496 | BLS / Non-Emergency - No ALS Needed / Q3020 | 4093324 | 14 Gauge IV Cath | 4004818 | Suction Cath. 8 FR. | |
| | | 4093324 | 14 Gage 2-in IV Cath | 4004842 | Suction Cath. 18 FR. | |
| | | 4000287 | 16 Gauge IV Cath | 4007423 | Yankauer | |
| 2900462 | BLS Emergency / Emergency or Immediate Response / Q3019 | 4007472 | 18 Gauge IV Cath | 4008082 | NG Tube - 10 FR. | |
| | | 4007480 | 20 Gauge IV Cath | 4000931 | NG Tube - 14 FR. | |
| | | 4007496 | 22 Gauge IV Cath | 4008355 | NG Tube - 16 FR. | |
| 2900058 | ALS-1 / Non-Emergency with ALS Services / A0426 | 4007506 | 24 Gauge IV Cath | 4005286 | NG Tube - 18 FR. | |
| | | 4011664 | Saline Loc | 4001053 | Suction Tubing | |
| | | 4000295 | Blood Infusion Set | | | |
| 2900140 | ALS-1 Emergency / Emergency or Immediate Response with ALS Assessment or Intervention / A0427 | 4004248 | Maxi-Drip IV Set | 4014049 | Diaph. Electrodes | |
| | | 4004271 | Micro-Drip IV Set | 4006005 | Adult Electrode | |
| | | 4003968 | IV Start Pack | 4008207 | Pedi. Electrode | |
| | | 4003422 | Lactated Ringers | 4012050 | Fast Patch | |
| 2900405 | ALS-2 Intubation, DEFIB, Pacing, >3 I.V.MedS / A0434 | 4003331 | Normal Saline - 250cc | 4004966 | Defib. Pads | |
| | | 4003323 | Normal Saline - 500cc | 4006462 | Zoll/Physic Pace Pads | |
| | | 4003430 | Normal Saline - 1000cc | | | |
| 2900439 | (SCT) / Specialty Care Transport / A0434 | 4003307 | D S W 500cc | 4000303 | Bulb Syringe | |
| | | 4016168 | Dial A Flow | 4003216 | Normal Saline Irr. | |
| | | | | 4003224 | Sterile Water Irr. | |
| 2900207 | Mileage Per Mile | 4004735 | All Oral Airways | 4004446 | C C U Gown Pack | |
| 2900231 | ALS Sec Supp /Defib (A0392) | 4005427 | ET 2.0mm - 5.5mm | 4005054 | All Sterile Gloves | |
| 2900264 | ALS Sec Supp /IV Drug (A0394) | 4005518 | ET 6.0mm - 10.0mm | 2900066 | Cold/Hot Packs | |
| 2900298 | ALS Sec Supp /Endo Intub (A0396) | 2900132 | Ambu Bag | 2900033 | Burn Sheet | |
| 2900322 | ALS Routine Disp Supp (A0398) | 4013694 | Ambu Mask | 2900454 | Disp. Obstetrics Kit | |
| 2900355 | AMB Wait Time (ALS/BLS) (A0420) | 4013975 | Oxygen Tubing | 4001087 | Oral Thermometer | |
| 2900389 | AMB (ALS/BLS) O2 & Supplies / Life Sustaining Situation (A0422) | 4013736 | Nasal Cannula | | | |
| | | 4013819 | Simple Mask | | | |
| 2900413 | Extra AMB Att. (req. med. review) (A042) | 4013835 | Non-rebreath Mask | | | |
| 2900447 | Rhythm EKG Strip (93041) | 4013836 | Ped Non-rebreath Mask | 3301058 | Adenocard 6mg/2ml vial | |
| 2900470 | AMB Treat Rend No Trans (A0990) | 4013942 | Pediatric Mask | 2900199 | ASA 325 mg Tablet | |
| CODE | | 4013959 | Trach. Mask | 3302866 | Atropine Syringe 1mg/ml | |
| 2900025 | Pulse Oximeter | 4013728 | Venturi Mask | 3305117 | Benadryl 50mg/ml | |
| 2900603 | Suction Unit | | | 3312451 | Brethine 1 m /ml amp | |
| 2900090 | C.P.R. Care | 4091385 | Abd Pad | 3302999 | Calcium Chloride lgm/10m1 | |
| 2900488 | Oxygen (A0070) | 4000030 | 2 x 2 | 3304722 | Dexamethasone 10m vial | |
| 2900272 | Intubation | 4000048 | 4 x 4 | 3304920 | Dextrose 50% 50cc syringe | |
| 2900157 | Cardiac Monitor | 4000162 | Gauze - 2 inch | 3306364 | Dopamine Hcl (Introp) 400mg | |
| 2900579 | Spinal Immob. (Minor) | 4000170 | Gauze - 3 inch | 3331931 | Epinephrine 1:1000 30ml amp | |
| 2900546 | Spinal Immob. (Major) | 4000188 | Gauze - 4 inch | 3305869 | Epinephrine 1:1000 1 ml amp | |
| 2900249 | Traction Splint | 4000196 | Gauze - 6 inch | 3305851 | Epinephrine 1:10,000 syringe | |
| S900330 | M. A. S. T. | 4000519 | Ace Bandage | 3306446 | Furosem (lasix) 10mg/ml 10ml vial | |
| 2900280 | Updraft | 4002966 | Kerlix | 3306727 | Haldol 5mg amp | |
| 2900348 | Cricothyrotomy | 4004685 | Vaseline Gauze | 3307683 | Isoprot Hcl (isuprel) 1 mg/5ml | |
| 2900199 | Miscellaneous, Auto Vent, Glucometer, Blood Draw, | 2900397 | Multi-Trauma Dressing | 3307923 | Labetalol 100mg/20ml | |
| 2900199 | Extremity Splint, IV Pump Maintenance, Limb Immobil, Chest/ Needle Decomp. | 2900660 | Triangular Bandage | 3306137 | Lidocaine Hcl 1% 100mg/10ml syr | |
| | | | | 3308251 | Lidocaine 0.4% 500cc bottle | |
| 2900314 | Emergency Childbirth | | | 3308426 | Magnesium Sulf 50% 10ml vi | |

PATIENT NAME: Thompson Johnny

DATE: 12-18-08

EMT RUN #

EMT SIGNATURE:

MILEAGE IN:

MILEAGE OUT:                    TOTAL MILEAGE:

| | |
|---|---|
| 3316577 | Narcan 2mg syr |
| 3332087 | NTG Spray 1 bottle |
| 3339900 | Phenobarbital 130mg amp |
| 3311123 | Procainamide 100mg/ml 10ml |
| 3311248 | Promethazine 50m /1ml amp |
| 2000487 | Proventil Soln. 4ml unit dose |
| 3311941 | Sod Bicarb 50meq/50ml syr. |
| 3312709 | Thiamine 100mg/1ml vial |
| 3313434 | Vasopressin 20units/ 1ml |
| 3300332 | Valium (diazepam) 10m vial |
| 3313459 | Veraamil Hcl 10m/2ml vial |
| 3300795 | Morphine Sulfate 10m/10ml |
| 3346780 | Instant Glucose |

Account #

# Call Report  2008025910

Call Taker - SINYARD
Date / Time Printed 12/18/2008 22:04

| Call When | How Received | Status | Priority | Disposition |
|---|---|---|---|---|
| 12/18/2008 21:07:28 | | | | FIRE DEPT |

**Location of Occurrence**

Saline County Jail | 735 S NEELEY BENTON

**Location of Caller**

735 S NEELEY BENTON

| Cross Street High | Cross Street Low | From - To Directions | Map Grid |
|---|---|---|---|

| Caller Name | Caller Phone | Primary Unit | ESN |
|---|---|---|---|
| LOBBS | | TRUCK-1 | 455 |

| Beat | Law | EMS | Fire |
|---|---|---|---|

## --- OCA Numbers Assigned ---

| Department | OCA Number |
|---|---|
| BENTON FIRE DEPT | 2008002613 |
| MED TRAN AMBULANCE | 2008008176 |

## --- Dispositions Assigned To Call ---

| Disposition | When Assigned | User |
|---|---|---|
| CLEAR | 12/18/2008 10:04:20 PM | MIDDLETON |
| FIRE DEPT | 12/18/2008 10:04:20 PM | MIDDLETON |

## --- Incident Types Assigned To Call ---

| Incident Type | Date Assigned | Time Assigned | Dispatcher |
|---|---|---|---|
| OVERDOSE | 12/18/2008 | 21:07:45 | SINYARD |

## --- Unit Times ---

| Unit ID | Department | Date | Time | Status | Dispatcher |
|---|---|---|---|---|---|
| TRUCK-1 | BENTON FIRE DEPT | 12/18/2008 | 21:08:03 | DISPATCHED | | MIDDLETON |
| MEDIC-1 | MED TRAN AMBULANCE | 12/18/2008 | 21:08:07 | DISPATCHED | | MIDDLETON |
| TRUCK-1 | BENTON FIRE DEPT | 12/18/2008 | 21:08:10 | ENROUTE | | MIDDLETON |
| MEDIC-1 | MED TRAN AMBULANCE | 12/18/2008 | 21:08:13 | ENROUTE | | MIDDLETON |
| TRUCK-1 | BENTON FIRE DEPT | 12/18/2008 | 21:11:14 | ON SCENE | | MIDDLETON |
| MEDIC-1 | MED TRAN AMBULANCE | 12/18/2008 | 21:13:26 | ON SCENE | | MIDDLETON |
| MEDIC-1 | MED TRAN AMBULANCE | 12/18/2008 | 21:27:39 | LEFT SCENE | CODE BLUE TO SMH MI 0 | MIDDLETON |
| MEDIC-1 | MED TRAN AMBULANCE | 12/18/2008 | 21:31:39 | ARRIVED DESTINATION | MI 2 | MIDDLETON |
| TRUCK-1 | BENTON FIRE DEPT | 12/18/2008 | 21:48:34 | CLEAR | | MIDDLETON |
| MEDIC-1 | MED TRAN AMBULANCE | 12/18/2008 | 22:04:20 | CLEAR | | MIDDLETON |

## --- Incident Locations ---

| Number | Dir | Street | Date | Time | Dispatcher | Apt/Loc | City | Coordinates | Landmark |
|---|---|---|---|---|---|---|---|---|---|
| | | | 12/18/2008 | 21:07:47 | SINYARD | | | | |



Benton, Arkansas

Currently
Partly sunny.
Refreshingly cool.
61°

Click for Forecast

Award Winning.

Monday, March 30, 2009

**Home      News      Sports      Classifieds      Obituaries**

Voted
Saline County's
#1 Auto Dealer
EVERETT
GMC



BENTON
146 W. South St.        315-2000
917 Military Rd.         315-0419

BRYANT
1702 N. Reynolds Rd.   847-0431

FDIC

Search
search...
Search

LANDERS

News
- Home
- Local News
- National News
- Business
- Horoscopes
- Obituaries
- Opinions/Editorials
- Features
- Recipe of the Day
- Photos
- Sudoku
- Entertainment

Sports
- Local Sports
- National Sports

Razorbacks
T-95 Game of the Week

Classifieds
- Place An Ad
- Classifieds

Service Directory

Make Us Your Homepage

The Benton Courier
- About Us
- Contact Us
- Subscribe
- Send Letter To Editor
- Announcement Forms
- Community Events

Around Town



Poll

What are your expectations for 2009?
- ○ It will be a banner year
- ○ It will be better than 2008
- ○ More of the same
- ○ It's going to get worse
- ○ Gloom and doom
- ○ I don't want to think about it
  Get back to me in

## Saline jail dead 3rd one in '08; cause of death not known

Saturday, 20 December 2008

A 28-year-old Benton man died late Thursday after being detained at the Saline County jail, authorities said Friday. .

The death of Johnny Thompson marks the third death this year at the new detention center in Benton. The first two deaths were reported as suicides.

The cause of death Thursday is not yet determined, but sheriff's Capt. Scotty Court-ney said "no foul play is suspected."

Thompson was ar-rested Thursday eve-ning on multiple warrants charging him with failure to appear in court. The warrants were issued by various law enforcement agencies in the state, Courtney said.

Courtney said Thompson was brought to the jail around 7 o'clock and was going through the booking process. Just before 9:20, the jail staff called 911. Med-Tran ambulance personnel took Thompson to Saline Me-morial Hospital in Benton, where he was pronounced dead at 9:30, Courtney said. Thompson's body has been sent to the state Crime Laboratory and Arkansas State Police authorities have taken over the investigation.

The first jail death was reported on July 6. Wade Hart, 21, of Benton was found dead in a cell after being arrested on a charge of public intoxication.

"Breakfast had been served about 7:30, and he was found when they were picking up trays," Courtney said.

"He used a piece of his clothing, which was tied around his neck and the sink and commode, which are one piece. He tied it around a piece of the unit and basically suffocated."

Courtney said that incident was reviewed and he does not believe that inadequate staffing — something the jail continues to struggle with — contributed to the death on July 6.

"Everything I've looked at, as far as policies and procedures go, doesn't lead me to believe that anything could have been changed to prevent this, unless we hire a jailer for every prisoner we have," he has said. "Unless you have somebody watching them every minute, things like this can happen when a person is really determined [to harm himself]."

On July 26, Giovanni Gurrieri Jr., 26, of Little Rock was found dead in a cell with a bed sheet tied around his neck. The other end of the bed sheet was tied around the top bunk of a bed.

Courtney and jail administrator Lt. Hugh Gentry said Gurrieri had shown no signs that he was suicidal or depressed and that he was expected to be released later that day. Gurrieri was also brought into the jail on a failure to appear warrant from Bryant for traffic violations. Officials said Gurrieri originally was to be released from jail even before the death, but after appearing in Saline County District Court, more charges were levied against him. The second warrant charged Gurrieri with breaking and entering and criminal attempt to commit theft of property, according to an arrest report from the Saline County jail.

"Saline County detectives served him with a felony warrant, and he was put back in jail," Courtney said, "but he was expected to be released [the day of his death]."

Courtney said neither Hart nor Gurrieri showed any signs of suicide or depression. He said if that had been noticed, administrators would have placed them under suicide watch. When placed under suicide watch, a prisoner's clothing is removed to prevent him or her from using any part of the clothing to cause harm to themselves, Courtney said. He also said the general population of inmates is checked about every hour.

"If you're determined to do it, you can kill yourself with a sock or underwear," Courtney said. "There was no indication at all that he had these kinds of thoughts."

Saline County Sheriff Phil Mask said after the second death that he was distraught of both deaths, but still stood by the accounts of his jail staff.

[ Back ]          < Prev          Next >


Teeter
CHEVROLET



CITY OF BENTON


Eisele
Law Firm, P.A.
Criminal Defense.
Car Wrecks. Divorces.


JONES
Heating & Air
501-776-8324
1-800-778-8386


PEST CONTROL
By
A D A M S



MARKETS

| Symbol | Last Tick | Chg |
|--------|-----------|-----|
| S&P 500 | 788.74 | -27.20 |
| DJIA | 7776.18 | -148.38 |
| NASDAQ | 1497.58 | -47.62 |

© quotemedia.com

QUOTES

Enter Symbol    GO

Symbol Lookup

Get Stock Quotes

State Farm' has lowered rates on car insurance. Get a quote.

*PX 10*

## Saline jail dead 3rd one in '08; cause of death not known

Saturday, 20 December 2008

A 28-year-old Benton man died late Thursday after being detained at the Saline County jail, authorities said Friday.

The death of Johnny Thompson marks the third death this year at the new detention center in Benton. The first two deaths were reported as suicides.

The cause of death Thursday is not yet determined, but sheriff's Capt. Scotty Courtney said "no foul play is suspected."

Thompson was arrested Thursday evening on multiple warrants charging him with failure to appear in court. The warrants were issued by various law enforcement agencies in the state, Courtney said.

Courtney said Thompson was brought to the jail around 7 o'clock and was going through the booking process. Just before 9:20, the jail staff called 911. Med-Tran ambulance personnel took Thompson to Saline Memorial Hospital in Benton, where he was pronounced dead at 9:30, Courtney said.

Thompson's body has been sent to the state Crime Laboratory and Arkansas State Police authorities have taken over the investigation.

The first jail death was reported on July 6. Wade Hart, 21, of Benton was found dead in a cell after being arrested on a charge of public intoxication.

"Breakfast had been served about 7:30, and he was found when they were picking up trays," Courtney said.

"He used a piece of his clothing, which was tied around his neck and the sink and commode, which are one piece. He tied it around a piece of the unit and basically suffocated."

Courtney said that incident was reviewed and he does not believe that inadequate staffing — something the jail continues to struggle with — contributed to the death on July 6.

"Everything I've looked at, as far as policies and procedures go, doesn't lead me to believe that anything could have been changed to prevent this, unless we hire a jailer for every prisoner we have," he has said.

"Unless you have somebody watching them every minute, things like this can happen when a person is really determined [to harm himself]."

On July 26, Giovanni Gurrieri Jr., 26, of Little Rock was found dead in a cell with a bed sheet tied around his neck. The other end of the bed sheet was tied around the top bunk of a bed.

Courtney and jail administrator Lt. Hugh Gentry said Gurrieri had shown no signs that he was suicidal or depressed and that he was expected to be released later that day. Gurrieri was also brought into the jail on a failure to appear warrant from Bryant for traffic violations. Officials said Gurrieri originally was to be released from jail even before the death, but after appearing in Saline County District Court, more charges were levied against him. The second warrant charged Gurrieri with breaking and entering and criminal attempt to commit theft of property, according to an arrest report from the Saline County jail.

"Saline County detectives served him with a felony warrant, and he was put back in jail," Courtney said, "but he was expected to be released [the day of his death]."

Courtney said neither Hart nor Gurrieri showed any signs of suicide or depression. He said if that had been noticed, administrators would have placed them under suicide watch. When placed under suicide watch, a prisoner's clothing is removed to prevent him or her from using any part of the clothing to cause harm to themselves, Courtney said. He also said the general population of inmates is checked about every hour.

"If you're determined to do it, you can kill yourself with a sock or underwear," Courtney said. "There was no indication at all that he had these kinds of thoughts."

Saline County Sheriff Phil Mask said after the second death that he was distraught of both deaths, but still stood by the accounts of his jail staff.

**Subject:** Attn GRS, more saline county jail deaths

# DWI suspect dies at Saline County jail

By Gavin Lesnick

Thursday, April 14, 2011

LITTLE ROCK — A 30-year-old East End man died in police custody Wednesday hours after being arrested on accusations of driving while intoxicated.

Police say Casey Babovec told another inmate he had ingested about 2 grams of crystal methamphetamine before he was pulled over, but it was not immediately confirmed if that was actually the case or if it caused the death. His body was sent to the Arkansas State Crime Lab for an autopsy.

Saline County Sheriff's Office Lt. Scottie Courtney said 2 grams of crystal meth is a "huge amount" and that he was sure it was at least a contributing factor in Babovec's death.

"There are things worse than jail time for getting caught with drugs," Courtney said. "I'm not trying to make light of this. But you do not want to eat drugs- that's just not smart."

According to a statement from Saline County Sheriff Bruce Pennington, deputies stopped Babovec around 1 p.m. and took him to the Saline County jail. At about 5 p.m., Babovec reportedly began acting strangely and then struck another inmate after he was placed in a holding cell.

"Detention Officers went in broke up the altercation and removed Babovec and began to subdue him," Pennington said in the statement. "After they subdued him, and placed him in another holding cell, alone, he became unresponsive."

Babovec was rushed to the hospital, where he was pronounced dead.

Police say a criminal and internal investigation was initiated after the death, per standard department procedure.

PX 11

STATE OF ARKANSAS          )

                           ) SS

COUNTY OF JEFFERSON   )


<u>AFFIDAVIT</u>

I James E. Grundon, do hereby swear, depose, and state the following:

1.     That on November 4, 2009, at approximately 8:00 PM, I was involved in a fight

with another inmate at the Saline County Jail. I was hit in my right eye, which broke my

cheekbone in several places.

2.     At approximately 8:30 PM, I notified Deputy Lawrence that I was injured,

stating that I had fallen in my cell for fear of being labeled as a "snitch" and being

retaliated upon by other inmates. Deputy Lawrence then notified Cpl. Westbrook that I was

hurt and needed medical attention.

3.     Cpl. Westbrook came to my cell, saw that I was bleeding and that my right

cheekbone moved when touched, and was obviously broken. He left, stating that he was

going to call Sgt. Lester and see what needed to be done.

4.     Shortly afterward, he returned to my cell and escorted me up front to the intake

area of the jail. He said that Sgt. Lester was calling a transport officer in order to take me

to the hospital.

5.     I was seated on the bench to wait for the transport officer. After a while, I was

asked to move and sit in the restraint chair because there were two female detainees who

had to sit on the bench. I was not restrained nor placed there for punishment of any sort.

- 1 -

PX 12

6.    After sitting there for what seemed like hours, in severe pain, I asked the intake officer, Deputy Davis, when I would be taken to the hospital. She replied that, "If you don't shut the f**k up, I'll taze you, and I've got a full battery." I told her I wasn't trying to be a problem, but that I was in severe pain, had been sitting there waiting for hours, and just wanted to know that someone was indeed coming to transport me. At this point, she pointed a tazer at me, and depressed the trigger enough for the light that aims it to shine on my chest and said, "I told you to shut the f**k up!" Deputy Smith, the other intake officer on duty, witnessed this.

7.    Cpl. Westbrook came out of the control booth then and assured me that a transport officer had been called and would be there to take me soon. He also asked Deputy Lawrence to bring me some Advil for pain, which he did.

8.    I'm unsure exactly how much longer I sat there, but eventually Cpl. Hart (whom I had previously filed a grievance against for misconduct) came to the jail to transport me to the hospital.

9.    When he saw me, he asked me, "What's wrong with you?" I told him that the bone under my eye was broken and that I could feel it moving around when I touched it. He said, "It just looks like a black eye to me," and went into the control booth where I could see him on the phone.

10.    When he came out, he walked past me toward the exit door. Cpl. Westbrook asked where he was going and he said, "I'm going home and back to bed; there's nothing wrong with him, and I'm not wasting the county's money on him." Cpl. Westbrook told him that he knew my face was broken and that he could see the bone moving when touched. Cpl. Hart ignored him and continued toward the door.

- 2 -

11.    I then told him that if he refused to take me to the hospital because he was mad at me for writing a grievance on him before, that I would sue him. he proceeded to leave anyway.

12.    Cpl. Westbrook then told me that he would go call Sgt. Lester and make sure he knew that I was really hurt, and ask him to send someone else to transport me.

13.    He came back a few minutes later and said that "it was out of [his] hands," that he had done all that he could do to convince Sgt. Lester that I really needed to go, but that Cpl. Hart had told him there was nothing wrong with me, and that I wouldn't be taken to the hospital.

14.    Cpl. Westbrook allowed me to use the phone to call my wife and mother to let them know what had happened, and to ask them to try to get in touch with the Sheriff or someone and get me some medical attention.

15.    I was then placed in the "drunk tank" for the rest of the night (November 4, 2009) with no access to a telephone, no mattress, no personal hygiene items, or even a clean washcloth to clean the blood from my wounds.

16.    I was given a mattress sometime on November 5, and then finally allowed to shower on November 7 when Cpl. Leach came on duty. He also got some of my hygiene items and my bible from my cell for me, and moved me from the "drunk tank" into another cell up front where I would not be subjected to the intoxicated people coming into the jail who were at times irate and displaying a propensity for violence.

17.    One such person who admitted being high on methamphetamine and alcohol, was tackled by several deputies and put into restraints after threatening two other guys in the cell, repeatedly beating on the door, and making lewd remarks to Deputy Davis.

- 3 -

18.    On November 5, 2009, my attorney (public defender), Gina Reynolds, came to visit me to discuss my pending charges. She asked what had happened to me when she saw me. I told her that I had been in a fight with another inmate, but that I had told the jail officers that I had fallen in my cell.

19.    She asked what the doctor had said, and I informed her that I had not seen one or even the jail medical staff.

20.    She stepped into the hallway and asked Lt. Pennington to come into the room with us. When he did, she asked him why I had not seen a doctor or been taken to the emergency room the night before, to which he replied that "He hasn't been forthcoming with us about what really happened to him. We know that he was in a fight, but he says he fell in his cell."

21.    Ms. Reynolds told him that did not matter, that she could even see that my face was broken and that my eyes did not look right to her, and she was worried I might have a concussion.

22.    She again asked why I had not seen a doctor and Lt. Pennington said, "These things don't happen immediately, but he will see a doctor." Ms. Reynolds asked him when, and he said "sometime today."

23.    I was allowed to call my wife and mother then and was able to tell them that I was going to be taken to a doctor that day sometime.

24.    My mom told me that she had talked to Lt. Pennington and he had told her that he didn't know why he would call her and worry her when there was nothing wrong with me; that I wasn't bleeding, and there was no swelling.

25.    She insisted that she knew better, that she knew I wouldn't call her and get her worried unless I was hurt badly.

26.    He then stated that it was "pretty sorry" of me to do so, and that I wasn't hurt. He told my mom he would "keep an eye on me," and that if there was any swelling or bruising that they would get me to a doctor.

27.    After Ms. Reynolds left, and I talked to my mom about what Lt. Pennington had told her the night before, I was placed back in the "drunk tank."

28.    That afternoon, November 5, I was taken to see Dr. Taggert at Family Practice Associates. He examined me and said that either the orbital bone under my eye, my cheekbone, or possibly both was definitely broken.

29.    He asked Deputy Hoolapa to take me upstairs to be examined by a specialist, Dr. Suddereth, and Saline Optical.

30.    Dr. Suddereth examined me and ordered an MRI to be done and for me to be brought back to him after he had the results from the MRI so he could determine if surgery was necessary.

31.    Dr. Suddereth and Deputy Hoolapa arranged with the jail (by phone) and Saline Memorial Hospital for the MRI to be done the next day (Nov. 6, 2009) and Dr. Suddereth's nurse set an appointment for the follow up with him on November 10, 2009 when the results were back.

32.    I was taken back to the jail and placed in the "drunk tank." I was not taken to the appointment for an MRI as Saline Memorial Hospital on November 6th.

- 5 -

33.    On November 10, 2009, I was taken to the follow-up appointment with Dr. Suddereth; however, without the MRI, he told Cpl. Hart, that he could not know how to treat my injury.

34.    He asked Cpl. Hart why I had not been taken for the appointment, and Cpl. Hart said that "no one was available to take him."

35.    Dr. Suddereth asked Cpl. Hart if I would be taken for a CT scan instead if he (Dr. Suddereth) were able to arrange for it to be done immediately downstairs in the hospital. Cpl. Hart said that I would and called Sgt. Lester and made him aware that he was taking me.

36.    The CT scan was done on November 10, 2009 and Dr. Suddereth said he would notify the jail what needed to be done as soon as he reviewed the results.

37.    On or around November 10, 2009, I was moved from the holding cell up front to a medical observation cell and was allowed to get my belongings from the ADC waiting cell where the fight occurred.

38.    I was also seen by the jail medical doctor on or around November 10, 2009, who prescribed pain medication and drops for my eye.

39.    On November ___, 2009, I was taken to Jones Eye Clinic at UAMS Hospital for a second opinion, I assume. I was seen there by Dr. _____, who examined my eye and also reviewed the results of the CT scan done at Saline Memorial Hospital.

40.    She said she was referring me to be seen by an Ear, Nose, and Throat Specialist as soon as possible, and that her office and the jail staff would set the appointment. She also said that Dr. Suddereth had recommended the same thing – for me to be seen by an

ENT Specialist who would determine what type of surgery was necessary, and then perform the surgery.

41.    I was not taken to the appointment with any ENT Specialist at UAMS, though it is my understanding that Dr. _____, or her staff, set the appointment up and notified Sgt. Lester of the date and time.

42.    On November 24, 2009, I was taken to an ENT Specialist named Dr. McGhee at Arkansas Otolaryngology in Saline Memorial Hospital. He said I needed surgery for a severely fractured cheekbone, and that it was already outside of the 14-day window for operating on such an injury, but that as long as it was done within the next few days, it would be okay.

43.    He asked Deputy Hoolapa if he scheduled the operating room at the hospital to perform the surgery, would they bring me, stating he had recently scheduled a surgery for another inmate (Bobby McReynolds) and on the day of the surgery learned that he inmate had been transferred to ADC.

44.    Deputy Hoolapa said that he would ask Sgt. Lester, and someone would let him know whether to schedule the surgery or not.

45.    On December 1, 2009, I was "fast-tracked" to ADC. No medical records of my injury were sent with me; therefore, I received no medical attention at Diagnostics.

46.    I was told by the staff there that once I got to my parent unit, I would be able to see a doctor, and they would get my medical records from the jail.

47.    I got here at Tucker Unit on December 22, 2009. I informed the nurse upon intake of my injury and was told they would check into what needed to be done, but

without any records, all she could really do was set me an appointment with the prison staff doctor here.

48.    On December 22, 2009, I was seen by Dr. Rectenwald here. He ordered for me to be taken to an outside doctor at UAMS.

49.    On March 18, 2010, I was seen at UAMS by Dr. _____. I was informed that he was ordering a CT scan that would tell him more, but that it was probably too late to fix.

50.    On April 23, 2010, I taken to St. Vincent's Hospital for a CT scan.

51.    Then on May 5, 2010, I was seen by a surgeon in Little Rock named Dr. Burnett, who informed me that it was too late to fix my face except by a plastic surgeon, who would have to cut away the bones that healed back incorrectly and re-build my cheekbone with plastic to keep my face from drooping. He also said that this would be the only way to correct the double-vision from my eye being depressed.

I further swear that the foregoing matters and things contained herein are true and accurate to the best of my knowledge, information, and belief.

James E. Grundon, AFFIANT
Tucker Unit/ P.O. Box 240
Tucker, AR. 72168-0240

SUSCRIBED AND SWORN TO BEFORE ME, a Notary Public, on this 4th day of October, 2010.

NOTARY

My commission expires: April 26, 2015

- 8 -